This is an appeal occasioned by the grant of a partial summary judgment, made final pursuant to Rule 54 (b), ARCP, in favor of Druid City Hospital Board (Druid City), a public hospital which serves the city and county of Tuscaloosa, Alabama. Druid City is one of five defendants named by Mr. and Mrs. M.C. Skelton in an action which arose from Mr. Skelton's alleged injury during a ventral hernia repair performed at that hospital. The Skeltons also claim damages for personal injuries against James H. Thomas, M.D., Anchor Manufacturing Company, Durr-Fillauer Medical, Inc., and Jimmy Thomas.
Count I of the Skeltons' complaint asserts that while M.C. Skelton was a patient at Druid City Hospital in Tuscaloosa, a surgical procedure was performed on Skelton by James H. Thomas, M.D. During the surgical procedure, a suturing needle being used by Dr. Thomas broke in Skelton's body, where part of it remains. Count I asserts negligence in the performance of their respective duties against all defendants.
Count II of the complaint claims damages for Mrs. Skelton as a result of her husband's injury.
Count III, the portion of the complaint that is the subject of summary judgment in favor of Druid City, asserts that Druid City Hospital Board, Anchor Manufacturing Company, Inc., Durr-Fillauer Medical, Inc., and Jimmy Thomas all impliedly warranted that the suturing needle which broke off in Skelton's body was fit for its intended purpose when sold or distributed to Skelton by such defendants. It further states the needle was not fit for its intended purpose and that, as a direct result, Mr. Skelton was injured.
In response to the Skeltons' complaint, Druid City filed a motion to dismiss or, in the alternative, a motion for summary judgment. Summary judgment was granted by the trial court in Druid City's favor as to count III.
 The Facts
Prior to a full discussion of the issue presented, and in order to clarify the circumstances from which this case arose, it is necessary to set out a few relevant facts.
First, a clarification regarding the parties involved is in order. Anchor Manufacturing Company is claimed by the plaintiffs to be the manufacturer of the suturing needle which broke during Skelton's surgery. Durr-Fillauer is a distributor of surgical products. After obtaining needles from Anchor Manufacturing Company, Durr-Fillauer allegedly sold them to Druid *Page 820 
City. Its salesperson, Jimmy Thomas, "called on" the hospital.
In opposition to Druid City's motion for summary judgment, plaintiffs presented the deposition of Mrs. Jane Sanders, the supervising nurse in Druid City's operating room. She testified regarding the care and use of suturing needles of the type involved in this case. Sanders stated she generally kept 12 dozen six packs of the suturing needles on hand (864 needles) for surgical procedures in the operating room. The needles were, she said, designed to be reuseable and were sanitized between uses by nurses on the 3:00 to 11:00 P.M. shift. Those nurses were responsible for inspecting the needles and replacing those that had become bent or dull. Sanders approximated that each needle was used for six or eight operations, but stated that the hospital had no way of determining how many times a specific needle had been used because the needles were not stored in any particular order.
Simply put, Druid City contends no implied warranty arose from its transaction with Skelton for which liability can be asserted. It relies mainly on the language of § 7-2-315, Code 1975, which provides as follows:
 "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."
Druid City successfully argued to the trial court that the Skeltons could not prevail under count III (alleging breach of implied warranty of fitness for particular purpose) because: (1) the hospital is in the business of providing a service to patients; it is not a "merchant" or a "seller" such that an implied warranty could arise from any transaction in goods between that institution and a patient; and (2) the suturing needle which broke off during Mr. Skelton's surgery was merely equipment used incident to providing a "service"; there was no "sale" of that needle to Skelton from which an implied warranty could arise.
The Skeltons argue on appeal to this court that Druid City did not meet its burden of proof as to the nonexistence of a genuine issue as to a material fact in support of the Skelton's implied warranty claims. Therefore, they contend, the trial court erroneously determined summary judgment appropriate regarding their claim that Druid City is guilty of breach of an implied warranty of fitness for a particular purpose of the suturing needle used during Mr. Skelton's ventral hernia repair.
The Skeltons insist that the Official Comments to § 7-2-315, and various other provisions of the Commercial Code indicate that section is to be liberally construed and supplemented by common law. They contend that, under both the statute and common law, such a warranty has arisen. Two of the provisions they rely on are as follows:
 "Although this section is limited in its scope and direct purposes to warranties made by the seller to the buyer as part of a contract for sale, the warranty sections of this Article are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined to sales contracts or to the direct parties to such a contract. . . . Beyond that, the matter is left to the case law with the intention that the policies of this Act may offer useful guidance in dealing with further cases as they arise." (Emphasis added.)
Official Comment, § 7-2-313, Code 1975.
 "(1) This title shall be liberally construed and applied to promote its underlying purposes and policies.
 "(2) Underlying purposes and policies of this title are:
 "(a) To simplify, clarify and modernize the law governing commercial transactions;" (Emphasis added.)
§ 7-1-102, Code 1975.
For guidance in disposing of the issues presented by the factual circumstances of *Page 821 
this case, we have considered the above and other provisions of the Commercial Code and cases which have arisen out of similar factual circumstances. For the reasons stated below, we reverse.
 I
First, we consider the applicability of § 7-2-315 to the transaction between Mr. Skelton and Druid City. (We need not reach Skelton's contention that an implied warranty has arisen under the common law.)
Druid City attempts to define that transaction as wholly consisting of a "service" to Skelton. We do not agree with that characterization. It can make no serious contention that Skelton did not pay for the use of the suturing needle, or that patients generally do not buy supplies and pay charges for equipment used in the course of their treatment.
Because of the nature of the re-use of the suturing needle at issue here, we do agree with Druid City that there was no "sale" of the needle to Skelton. Rather, the instant transaction is more akin to a lease or rental of equipment than a sale. That does not, however, preclude an implied warranty of fitness for a particular purpose from arising from the transaction.
Article 2 of the Uniform Commercial Code applies, by its terms, to "transactions in goods." Section 7-2-102, Code 1975. That phrase is left undefined by the Code, but a number of courts have held there is significance in the use of the term "transaction" rather than "sale." In light of the statement in the Official Comment to § 7-2-313, that the warranty sectionsof Article 2 "need not be confined to sales contracts," we opine our legislature intended that § 7-2-315 be broadly interpreted to include transactions in which there is no actual transfer of title, such as rental and lease transactions. Numerous courts have so held. See, i.e., W.E. Johnson EquipmentCo. v. United Airlines, Inc., 238 So.2d 98, 101 (Fla. 1970);Baker v. City of Seattle, 79 Wn.2d 198, 484 P.2d 405 (1971);Quality Acceptance Corp. v. Million Albers, Inc., 367 F. Supp. 771,773 (D.Wyo. 1973); Fairfield Lease Corp. v. CommodoreCosmetique, Inc., 7 U.C.C.Rep.Serv. 164 (N.Y.Civ.Ct. 1979); andFairfield Lease Corp. v. U-Vend, Inc., 14 U.C.C.Rep.Serv. 1244, 1246 (N.J. 1974); and All States Leasing Co. v. Bass, 96 Idaho 873, 538 P.2d 1177 (1975).
Therefore, we conclude the transaction here involved is both a service transaction and a "transaction in goods." This court has previously addressed the issue whether implied warranties arise from "mixed" or "hybrid" agreements, those that involve both a sale of goods and a rendering of services. In Caldwellv. Brown Service Funeral Home, 345 So.2d 1341 (Ala. 1977), the plaintiffs sought the service of a funeral home for the burial of their eight-year-old son. They signed a statement for the services and for a casket and vault in the aggregate sum of $860. Because the vault provided by the funeral home was too small for the casket, graveside services had to be conducted twice.
The plaintiffs sued on a theory of implied warranty of fitness and the trial court granted summary judgment in favor of the funeral home as to the implied warranty claims. The funeral home argued it had merely provided a "service" for the plaintiffs and, therefore, no warranty could have arisen. Reversing that court's judgment, we stated:
 "Here the funeral home knew that the Caldwells were purchasing a vault for the casket of their son, and that they were relying on the seller's judgment to furnish suitable goods. As a professional in this business, the seller could be expected to be aware of any size requirements for the vault to hold the casket which the seller also sold. This implied warranty of fitness was neither excluded nor modified in any way by the funeral home. Moreover, under § 2-715 of Title 7A, the Caldwells may be entitled to incidental and consequential damages resulting from the funeral home's breach."
345 So.2d 1342.
The Caldwell case cannot be distinguished from the present case regarding *Page 822 
the issue whether the provider of a service can be held liable under § 7-2-315. In both cases the plaintiffs went to the defendants seeking services and products necessary to those services; and in both cases the plaintiffs were submitted a total bill for the products and the services. In both cases the plaintiffs were injured by the products sold with the services, and in both cases the plaintiffs relied upon the skills and expertise of the defendants in selecting the involved products. This same approach to "hybrid" transactions has been adopted by other courts.
In Newark v. Gimbel's, Inc., 54 N.J. 585, 258 A.2d 697
(1969), the court found an implied warranty of fitness where a beauty parlor operator administered a permanent wave solution which injured a patron. It stated:
 "A beauty parlor operator in soliciting patronage assures the public that he or she possesses adequate knowledge and skill to do the things and to apply the solution necessary to produce the permanent wave in the hair of the customer. When a patron responds to the solicitation she does so confident that any product used in the shops has come from a reliable origin and can be trusted not to injure her. She places herself in the hands of the operator relying upon his or her expertise both in the selection of the products to be used on her and in the method of using them. The administrations and the products employed on her are under the control and selection of the operator; the patron is a mere passive recipient."
258 A.2d at 701-702.
In Berry v. G.D. Searle Co., 56 Ill.2d 54, 309 N.E.2d 550
(1974), the plaintiff suffered a stroke from birth control pills distributed by a Planned Parenthood Clinic. The Illinois Supreme Court rejected the conclusion that Planned Parenthood Association was merely performing an incidental service in distributing the drugs and was not engaged in selling these items. It subjected the clinic to implied warranty liability under the Uniform Commercial Code.
In Mauran v. Mary Fletcher Hospital, 318 F. Supp. 297 (D.Vt. 1970), implied warranty liability was imposed where a patient was injured when insulin was administered instead of preoperative medicine. That court stated: "[T]he fact that the sale of anesthesia here is a minimal element in the overall transaction does not mean that there cannot be a sale in the administration of anesthesia." See also Shaffer v. VictoriaStation, 91 Wn.2d 295, 588 P.2d 233 (1978); and ProvidenceHospital v. Truly, 30 U.C.C.Rep.Serv. 785, 611 S.W.2d 127
(Tex.Ct.Civ.App. 1980).
Based on the above cited precedents regarding the application of U.C.C. § 2-315, and this court's prior construction of the language employed by the legislature in our § 7-2-315, we conclude Druid City is a "seller" of goods within its meaning.
 II
Druid City further claims that, even if it is a "seller" of goods, because of its status as a hospital, it is not a "merchant" as defined and required by the provisions of the Code and has not held itself out as having "knowledge or skill peculiar to the practices or goods involved in the transaction." We find that claim untenable for several reasons.
First, the definition of "merchant" in the Code is a broad definition which does not exclude institutions such as hospitals.
 "`Merchant' means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill."
§ 7-2-104 (1), Code 1975.
We cannot ignore the fact that hospitals, whether profitable or not, are businesses. They are not merely buildings which *Page 823 
provide housing for the seriously-ill patients or independent physicians.[1]
In the course of their competition, hospitals certainly hold themselves out to the public as having special knowledge regarding the provision of medical services to patients. Inherent in this presentment is a warranty that the hospital will sell, furnish, or supply patients with goods for use in the provision of medical services which are fit for their intended purpose. For that reason, Druid City is clearly a "merchant," within the Commercial Code's definition of that word.
Assuming, arguendo, that this court determined that Druid City is not a "merchant," it would still be liable under U.C.C. § 2-315 because of the nature of the patient's reliance on the skill and judgment of the hospital in the selection of medical supplies used for the care of the patient. Comment 4 to §7-2-315 states:
 "Although normally the warranty will arise only where the seller is a merchant with the appropriate `skill or judgment,' it can arise as to nonmerchants where this is justified by the particular circumstances."
The gist of an action under this section is reliance.
Patients are rarely in a position to judge the quality of the medical supplies and other goods sold to them and used in their care; often, those supplies are of an inherently dangerous nature. The complete dependence of patients on the staff of a hospital to choose fit products for their care justifies the imposition of an implied warranty under § 7-2-315, whether the hospital is a "merchant" or not.
 III
Finally, we note that, were this court to exclude hospitals from the implied warranty provisions of the Code based on the arguments presented by Druid City, the effects would be far-reaching. The hospital's theory would, for example, create an exemption from § 7-2-315 for the service department of an automobile repair shop which installs defective brakes on a car. Assume that same business had a parts department which sold a consumer defective brakes to be installed by the consumer. Under Druid City's rationale, it would be liable under § 7-2-315.[2] We conclude the legislature adopted § 7-2-315
in anticipation of both situations.
That conclusion is further substantiated by the evidentiary problems which would arise from any other treatment of the hybrid sale/service transaction. For instance, release of the hospital from liability for breach of implied warranty would break the chain of the passage of the needle from the manufacturer to Skelton. The result would be that the manufacturer and the distributor of the needle could, at trial, attempt to "scapegoat" the hospital. In the instant case, the facts indicate the hospital claims to inspect the suturing needles before turning them over to surgeons for use. The hospital is, therefore, the only party defendant to the claim of breach of warranty that can rule out the possibility it has misused the needle. If this court were to release the hospital from responsibility on that count, it would make the burden of proof for the plaintiff onerous by creating an "empty chair" at the defense table.
For the above reasons, we hold the trial court erred in granting summary judgment in favor of Druid City Hospital Board on count III of the plaintiffs' complaint alleging breach of an implied warranty. The judgment entered by that court is due to *Page 824 
be, and is hereby, reversed, and this cause is remanded to that court for further proceedings in accordance with this opinion.
REVERSED AND REMANDED.
FAULKNER, JONES, ALMON, and ADAMS, JJ., concur.
TORBERT, C.J., and MADDOX and SHORES, JJ., concur specially.
BEATTY, J., not sitting.
[1] Some courts have discarded the notion that hospitals are only liable under the theory of respondeat superior, to hold that hospitals have an independent affirmative duty of care owed directly to the patient. See Pedroza v. Bryant, 101 Wn. 226,677 P.2d 166 (1984), where the Washington Supreme Court adopted a corporate negligence doctrine, establishing that hospitals owe patients an independent duty to use care in selecting staff members and supervising the quality of treatment rendered by staff members to all hospital patients within the hospital's facilities.
[2] To exclude the party that has provided goods plus a service for a set price from liability under § 7-2-315 is not logical because that party has an incentive — the maximization of profit — to use inferior goods.